## Case No. 15,205a.

### UNITED STATES v. GILLIAM.

[1 Hayw. & H. 109.] [1]

Criminal Court. District of Columbia. Sept. 14, 1882.

HOMICIDE — KILLING BY SET SPRING-GUN — BAD CHARACTER OF DECEASED.

1. The court will allow evidence to be given of the previous bad character of the deceased, when the said deceased had been killed in the act of committing a felony. It is proper in determining the intent of the deceased and the offence of the prisoner, who is accused of killing the deceased.

2. The setting of spring-guns in open fields or outhouses, not within the privilege of the domicil, without notice, will not excuse or justify the homicide which might ensue.

The indictment contained two counts. One charging the murder to have been committed by means of a spring-gun set by the traverser for that purpose in a goose-house; the other that the murder was done by shooting. The prisoner [William Gilliam] plead not guilty.

P. R. Fendall, Dist. Atty., for the United States.

W. L. Brent, for defendant.

The counsel for the prisoner, insisted that the prisoner had a right to defend his property by such means. One of the witnesses examined on the part of the United States was questioned by the prisoner's counsel as to the general reputation of the deceased as

1 [Reported by John A. Hayward, Esq., and George C. Hazleton, Esq.]

a thief and a felon. The question was objected to by the counsel for the United States.

BY THE COURT. The prisoner, by his counsel, has asked the court to allow him to give evidence of the general character of the deceased as a common thief and felon, for the purpose of showing the felonious intent with which the deceased entered upon the premises of the prisoner on the night he was shot by the spring-gun, and insists that in all cases of meditated felony it is lawful to take the life of the felon. It has been ruled at the present term of this court that, to show a guilty knowledge in the receiver of stolen goods it is proper to allow proof that other stolen goods had been before received by the party charged, and in the case at bar the court will allow proof that the deceased had, on previous occasions, stolen the goods, either of the prisoner or other persons, as proper for the consideration of the jury in determining the intent of Payne (the deceased) and the offence of the prisoner. The setting of a spring-gun as a protection for property, though not in itself unlawful and indictable, is certainly undeserving of encouragement, and where no notice is given and injury or loss of life ensues, the party setting it is responsible as if he were present himself and fired the weapon. No man can do indirectly what he cannot do directly. He must also use his right as not to injure another. Where notice is given the sufferer is held to have brought the calamity on himself—to be his own executioner if life is lost, and to have himself pulled the trigger. Such was the reasoning of the court of king's bench in the case of Ilott v. Wilkes, 3 Barn. & Ald. 304.[2]

All the judges in that case rest their judgment on the ground of notice.

It has been contended by the prisoner's counsel in this case, that if Payne, the deceased, entered upon the premises of Gilliam on the night he came by his death, with the felonious intent to steal Gilliam's property, the prisoner is entitled to acquittal in the absence of notice that the gun was set, and though the felony was unaccompanied by force and did not amount to burglary. The broad ground is assumed that in all cases of felony, the felon may be lawfully put to death in the execution of his meditated crime, and that this position is maintained by the reasoning of one of the judges in the case of Ilott v. Wilkes; I cannot sanction the doctrine thus asserted in the prisoner's defense. It arrogates for property higher immunities and privileges than are conceded to our dearest personal rights. The humane principles of the law do not thus lightly estimate human life. No language or man-

ner, however reproachful or insulting, not even violence to the person of the most ignominious character, will justify the aggrieved in slaying the aggressor; he can only be justified or excused by showing his own life to have been in jeopardy. The law is that a man may oppose force with force in defense of his person, his family or property against one who manifestly endeavors by violence to commit a felony, as murder, robbery, rape, arson or burglary. In all these felonies, from their atrocity and violence, human life either is, or is presumed to be in peril. The principle does not apply to the thief who secretly steals your purse or other personal property in your fields or in buildings not within the privilege of the domicil. It does not apply to the felon who, by forgery, defrauds you of your money or goods. This distinction commends itself to your reason and common sense, and it is sustained by numerous authorities which have been cited in the argument by the counsel for the United States. When we find the books and the judges in some places in general terms speaking of the right to take the life of the felon in the execution of his meditated felony, we are to understand them as referring to felonies with force, of the character described. In no other way can we reconcile what would otherwise appear conflicting authorities and decisions. The setting of spring-guns, therefore, in open fields or outhouses, not within the privilege of the domicil, without notice, would not justify or excuse the homicide which might ensue, but the party setting them would be criminally responsible for the consequences of his act.

The counsel for the prisoner further contended that by the law as it stood prior to the statute of 7 & 8 Geo. IV. c. 29, § 13,[3] and as it now stands here, any outhouse within the curtilage, or same common fence as the dwelling house itself, was considered to be parcel of the dwelling house, on the ground that the capital house protected and privileged all its branches and appurtenances, if within the curtilage or homestall.

The counsel for the United States contended that on a fair view of the authorities on the subject of curtilages prior to the statute of Geo. IV., an outhouse, to be within the protection of the dwelling house, must be "occupied with and immediately communicating with it"; must be adjoining to it or at a reasonable distance from it, and that the communication must be regular and permanent, not merely casual or temporary, that the meaning of the word "outhouse" was

---

[2] "A trespasser, having knowledge that there are spring-guns in a wood, although he may be ignorant of the particular spots where they are placed, cannot maintain an action for an injury received in consequence of his accidental treading on the latent wire connecting with the gun, and thereby letting it off."

[3] What buildings only are a part of a house for capital purposes: "That no building, although within the same curtilage with the dwelling house, and occupied therewith, shall be deemed to be part of such dwelling house for the purpose of burglary * * * unless there shall be a communication between such building and dwelling house, either immediate or by means of a covered and enclosed passage leading from one to the other."

the same before as after the enactment of the statute. In Rex v. Scully, 1 Car. & P. 319,[4] 11 E. C. L. 407, decided in 1824, several years before the statute, it was held that the hen-roost was not part of the curtilage.

In the further progress of this cause evidence was offered to prove that the goose house, in which the spring-gun was set by Gilliam, and in attempting to enter which Payne was killed by the discharge of the gun, was situated within from thirty-five to sixty feet of the dwelling house of Gilliam, in which himself and his family resided and slept; that the said goose house, and out-houses appurtenant to and used with the dwelling, together with said dwelling house, were enclosed by a common fence surrounding them, the whole premises not exceeding in extent one acre of ground; that there was an interior partition fence of stone, not laid in mortar, about three feet high, but with an opening in it about two feet wide, to let Gilliam's family pass through to the goose house, and that the said stone fence, with a rail upon the opening, was used to keep the cows from coming to the dwelling house.

Upon which said evidence. and the other evidence in the cause, the prisoner's counsel prayed the court to instruct the jury: That if they believe, from the evidence aforesaid. that the said goose house was appurtenant to, and used with Gilliam's dwelling house as one of the out-houses thereof, and that the whole were under one common enclo-sure, and that the said goose house was not more than sixty feet distant from said dwell-ing. then the said goose house was within the curtilage, and privileged as part of said dwelling, and the breaking and entering the same in the night time by the deceased with the intent to steal Gilliam's geese in said goose house, if believed to be true by the jury, was burglary, and if the deceased came to his death in the attempt to commit said burglary, by the spring-gun set there by Gilliam to protect his goose house, the pris-oner is entitled to a verdict of acquittal.

Which instruction the court gave.

The jury returned a verdict of not guilty.

---

[4] "A person set to watch a yard or garden, is not justified in shooting any one who comes into it in the night, even if ne should see the party go into his master's hen roost. But if, from the conduct of the party, he has fair ground for be-lieving his own life in actual and immediate danger, he is justified in shooting him."

